IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| HENRY G. CARTER, an individual, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>INDEPENDENT PRODUCTIONS, INC., )<br>a Pennsylvania corporation, and )<br>GEORGE THOROGOOD & THE )<br>DESTROYERS, INC., a Pennsylvania )<br>corporation, )<br>)<br>Defendants. ) | C.A. NO.<br><br>JURY OF TWELVE DEMANDED |

## COMPLAINT

Plaintiff Henry G. Carter ("Carter") by his attorneys, for his complaint for breach of contract, a declaratory judgment setting forth the rights and obligations of the parties and an accounting, alleges as follows:

1. Plaintiff Carter is an individual residing in Delaware.

2. Defendant Independent Productions, Inc. ("IPI") is a Pennsylvania corporation whose registered address is R.D. 1, Box 216, London Tract Road, Landenberg, Pennsylvania 19350.

3. Defendant George Thorogood & The Destroyers, Inc. ("GTDI") is a Pennsylvania corporation whose registered address is R.D. 1, Box 216, London Tract Road, Landenberg, Pennsylvania 19350.

### Jurisdiction and Venue

4. The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) based upon the diversity of citizenship of the parties. The amount in controversy exceeds Seventy-Five

Thousand Dollars ($75,000). The Court also has jurisdiction pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201(a).

5. Venue is appropriate in this District pursuant to 28 U.S.C. § 1391(c).

## The Facts

6. Carter is an accomplished musician and performer who plays numerous instruments including, *inter alia*, the saxophone, keyboards, guitar, trumpet and mandolin. Carter is also a capable vocalist and an accomplished musical arranger.

7. On or about July 4, 1979, Carter joined the rock and roll/blues band George Thorogood and the Delaware Destroyers (the "Band").

8. The members of Band at that time were George Thorogood, Jeff Simon, and Bill Blough. They were, at all times pertinent herein, the other shareholders with Carter of IPI and GTDI.

9. When Carter joined the Band, it was commanding approximately $2,000 to $3,000 per live performance.

10. The fortunes of the Band changed dramatically during Carter's tenure and the Band enjoyed significant commercial success. At the pinnacle of its performing career, the Band commanded live performance fees in the low six figures.

11. While Carter was a member of the Band, the Band released over 16 albums, many of which went gold, and some platinum.

12. The Band is an internationally acclaimed rock and roll/blues band that has been in the music business in various iterations for over thirty years. IPI recently released the career retrospective of the Band: *George Thorogood: 30 Years of Rock* (the "Album"). The Album has been certified gold by the RIAA and was named the No. 1 top blues album for 2005 by Billboard

Magazine. The Album has been a chart fixture since its May 2004 release holding the No. 1 spot for 42 weeks in 2005.

### The Organizational Structure of the Band

13. In the early 1980's, the Band formed IPI to handle its newly-developed recording business and to, *inter alia*, insulate its recording revenue from potential liability exposure from the Band's touring activities. GTDI, which previously handled all Band activities, now handled only its performance, previously-existing recording contracts and touring businesses. Merchandising for the Band, including the sales of tee-shirts and other merchandise, was also handled by GTDI since about 1997.

14. Carter, at all times, held and holds an equity stake in IPI and shares royalty revenue from the recordings released by IPI. Each band member was entitled to a fixed share of royalty revenue from each recording. At all times, the percentage of royalty revenue paid to the Band members was based on whether a Band member appeared on a particular album, without regard to the number of songs the Band member played on the album. Even if a Band member appeared on only one song for a particular album, the Band member would still receive the agreed-upon royalty percentage. Unlike other members of the Band, Carter often contributed several instrumental pieces on particular tracks as well as contributing back up vocals.

15. Since the mid to late 1980's, Carter has been paid 20 percent of the net royalties generated by all record sales released under the auspices of IPI.

16. Carter is also an equity holder in GTDI. At all times during his tenure in the Band, Carter shared in profits attributable to the Band's touring operations, along with profits attributable to all other band-related operations. Such profits were distributed by GTDI. Carter

engaged in all business affairs of the corporation, attended semi-annual shareholder meetings, and even made capital outlays on several occasions.

17. Carter was involuntarily released from touring and recording activities of the Band but at all times, held, and still holds an interest in IPI and GTDI.

18. Subsequent to his release, Carter was and is entitled to receive touring revenue from GTDI in connection with the tours that Carter participated in and is entitled to be compensated for the goodwill he helped create for the Band during his two-decade tenure.

19. Subsequent to his release, Carter was and is entitled to receive recording royalties from IPI and GTDI in connection with the albums that Carter appeared on for records distributed by, *inter alia*, Rounder Records, EMI Records and Eagle Entertainment.

20. Subsequent to his release, Carter has received royalty payments from IPI that are sporadic and inexplicably reduced by a "management fee" assessed against the Band, even though Carter does not receive any management services, against the express representations of the Band's counsel that Carter's portion of recording royalties would not be expensed. Carter, despite requests, has also not been provided all royalty related sales data and contracts to ascertain whether he has, in fact, received his agreed-upon percentage of royalties.

21. On or about July 2003, Carter received his first recording royalty check from the Band since being released. Despite the Band's representations, Carter's share of the royalties was expensed a 17 percent% management fee, for services he no longer received.

22. On or about August 2005, Carter received his first royalty check from the Album. Carter appears on 11 of the 16 tracks on the Album. However, despite past agreements and established practice of the Band, Carter received only $11/16^{ths}$ of his agreed 20 percent of the royalties and was expensed again for phantom "management fees."

23.  Carter continues to receive recording royalties improperly expensed by management fees. Carter continues to receive royalties from the Album improperly reduced to $11/16^{th}$, of the amount to which he is entitled and improperly expensed by management fees.

### Count I
### Breach of Contract

24.  Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 23 and incorporates them herein by reference.

25.  IPI has breached its contract with Carter by paying royalties on a per-song appearance basis rather than the agreed and customary album appearance basis for the Album.

26.  IPI has breached its contract, as supplemented by the parties, with Carter by reducing Carter's share of royalty payments for Band management services he no longer receives since he was released from the Band.

WHEREFORE, Carter demands judgment in excess of $75,000 in an exact amount to be proved at trial.

### Count II
### Accounting

27.  Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 26 and incorporates them herein by reference.

28.  Since Carter was released from the Band in March 2003, he has not had access to the financial information of either IPI or GTDI to ascertain whether his share of royalty payments is accurate.

29.  Upon information and belief, the Band has not paid Carter all royalties from recordings, royalties from merchandising, and revenues from touring for which he is entitled since he was released from the Band.

30. Carter demands an accounting from both IPI and GTDI for his agreed 20 percent share of all recording revenue received by IPI and GTDI, his agreed 20 percent share of touring revenue from GTDI, his agreed 16 percent of merchandising revenue and compensation for the goodwill he helped create with the Band.

### Count III
### Declaratory Judgment

31. Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 30 and incorporates them herein by reference.

32. Carter is not and has never been in material breach of his agreement with IPI.

33. The terms of Carter's agreement with IPI are in dispute with respect to the way royalties will be computed, i.e., per track appearance or per album appearance, as well as Carter's liability for management fees for services he no longer receives.

34. There is an actual case or controversy regarding these issues.

35. Carter is entitled to a declaration that he shall receive royalties of 20 percent for each Band record he appears on irrespective of the number of tracks he performs vis-à-vis the album in issue and a declaration that his share of royalties, since June 2003, shall not contain any deductions for management services and that he shall be afforded reasonable auditing rights for royalties received by IPI.

### Count IV
### Declaratory Judgment

36. Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 35 and incorporates them herein by reference.

37. Carter is not and has never been in material breach of his agreement with GTDI.

38. Carter is entitled to a declaration that he shall receive 20 percent of touring revenues generated by the Band and a declaration that his share of those revenues, since July 2003, shall not contain any deductions for management services and that he shall be afforded reasonable auditing rights for revenues received by GTDI.

### Count V
### Declaratory Judgment

39. Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 38 and incorporates them herein by reference.

40. During Carter's tenure with the Band, he significantly contributed to the good will developed in the Band's live performances and contributed to the Band's live performance revenue's exponential increase.

41. As a result of the goodwill Carter helped build up with GTDI, the touring corporation for the Band, GTDI has been able to merchandize tee-shirts and other souvenirs at concerts. Prior to his release from the Band, Carter received 16 percent of merchandizing revenue.

42. There is an actual dispute with respect to Carter's entitlement to an ongoing percentage of merchandizing revenue as a result of his equity position in GTDI and his contribution over two decades to the goodwill now enjoyed by GTDI.

### Count VI

43. Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 42 and incorporates them herein by reference.

44. On September 1, 2002, the Band signed a recording contract with Eagle Records (the "Recording Agreement").

45. Carter is named as an individual bound by the terms of the Recording Agreement which provides, *inter alia*, that Carter may not record for any reason until the Band's obligations to Eagle under the contract are satisfied.

46. The Band has not released Carter from the Recording Agreement and Carter has been unable to earn a living as a musician as a result of the Band's refusal.

47. The Band has breached, *inter alia*, the covenant of good faith and fair dealing by refusing to release Carter from the Recording Agreement.

48. As a party bound by the Recording Agreement, Carter is entitled to a 20 percent share of the net proceeds of royalties received from all Eagle recordings even though he does not appear on albums which were recorded subsequent to his termination from the Band, and damages for earnings and profits lost due to the Band's failure, due to bad faith, to release Carter from the Recording Agreement.

WHEREFORE,

As to Count I of the Complaint, Plaintiff Henry G. Carter respectfully demands judgment in his favor and against Defendant Independent Productions, Inc. in excess of Seventy-Five Thousand Dollars in an exact amount to be proved at trial, plus interest, penalties, attorneys' fees, costs of this action, and all other relief that the Court deems just and proper.

As to Count II of the Complaint, Plaintiff Henry G. Carter demands an accounting for his agreed 20 percent share of all recording revenue received by IPI and GTDI since June 2003.

As to Count III of the Complaint, Plaintiff Henry G. Carter demands a declaration that he shall receive ongoing royalties of 20 percent for each Band record on which he appears, regardless of the number of tracks he performs on the album in issue, a declaration that his share of revenue from June 2003 on, shall not contain any deductions for management services, a declara-

tion of the value of the goodwill Carter created for the Band, and a declaration that he shall be afforded reasonable auditing rights for royalties received.

As to Count IV of the Complaint, Plaintiff Henry G. Carter demands a declaration that he shall receive 20 percent of ongoing revenues attributable to touring operations of the Band from July 2003 on by virtue of his ongoing equity interest in GTDI, a declaration that his share of such revenues from June 2003 on, shall not contain any deductions for management services and that he shall be afforded reasonable auditing rights for revenues received.

As to Count V of the Complaint, Plaintiff Henry G. Carter demands entitlement to an ongoing percentage of merchandizing revenue as a result of his contribution over two decades to the goodwill enjoyed by George Thorogood & The Destroyers, Inc., enabling GTDI readily to sell merchandise at its live performances.

As to Count VI of the Complaint, Plaintiff Henry G. Garter demands a declaration that he shall receive an ongoing 20 percent share of the net proceeds of royalties received from all Eagle recordings which were recorded subsequent to his termination from the Band, and damages for losses due to the Band's bad faith failure to release Carter from the Recording Agreement.

CONNOLLY BOVE LODGE & HUTZ LLP

  /s/ James D. Heisman
Charles J. Durante (# 800)
James D. Heisman (# 2746)
1007 N. Orange Street
P. O. Box 2207
Wilmington, DE 19899
(302) 658-9141
*Attorneys for Plaintiff*

Dated: June 29, 2007

AO FORM 85 RECEIPT (REV. 9/04)

United States District Court for the District of Delaware

Civil Action No. __07-418__

# ACKNOWLEDGMENT OF RECEIPT FOR AO FORM 85

## *NOTICE OF AVAILABILITY OF A UNITED STATES MAGISTRATE JUDGE TO EXERCISE JURISDICTION*

I HEREBY ACKNOWLEDGE RECEIPT OF ____2____ COPIES OF AO FORM 85.

__6/29/07__
(Date forms issued)

(Signature of Party or their Representative)

__Zach Horne__
(Printed name of Party or their Representative)

Note: Completed receipt will be filed in the Civil Action

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS
HENRY CARTER

**DEFENDANTS**
INDEPENDENT PRODUCTIONS, INC.
GEORGE THOROGOOD AND THE DESTROYERS, INC.

(b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF: New Castle
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT: Chester County
(IN U.S. PLAINTIFF CASES ONLY)

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

(c) ATTORNEYS (FIRM NAME, ADDRESS AND TELEPHONE NUMBER)

Charles J. Durante (# 800)
James D. Heisman (# 2746)
CONNOLLY BOVE LODGE & HUTZ LLP
1007 N. Orange Street, P.O. Box 2207
Wilmington, Delaware 19899
Telephone: (302) 658-9141

ATTORNEYS (IF KNOWN)

## II. BASIS OF JURISDICTION (PLACE AN "X" IN ONE BOX ONLY)
- ☐ 1 U.S. Government Plaintiff
- ☐ 2 U.S. Government Defendant
- ☐ 3 Federal Question (U.S. Government Not a Party)
- ☒ 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN "X" IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated or Principal Place of Business in This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. ORIGIN (PLACE AN "X" IN ONE BOX ONLY)
- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from another district (specify)
- ☐ 6 Multidistrict Litigation
- ☐ 7 Appeal to District Judge from Magistrate Judgment

## V. NATURE OF SUIT (PLACE AN "X" IN ONE BOX ONLY)

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 620 Other Food & Drug | | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 423 Withdrawal 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 630 Liquor Laws | | ☐ 450 Commerce/CC Rates/etc |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers Liability | ☐ 640 R.R. & Truck | **PROPERTY RIGHTS** | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | ☐ 650 Airline Regs. | | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl Veterans) | ☐ 345 Marine Product Liability | ☐ 680 Occupational Safety/Health | ☐ 820 Copyrights | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 690 Other | ☐ 830 Patent | ☐ 850 Securities/Commodities Exchange |
| ☐ 160 Stockholders Suits | ☐ 355 Motor Vehicle Product Liability | | ☐ 840 Trademark | ☐ 875 Customer Challenge 12 USC 3410 |
| ☒ 190 Other Contract | ☐ 360 Other Personal Injury | | | ☐ 891 Agricultural Acts |
| ☐ 195 Contract Product Liability | **PERSONAL INJURY** | **LABOR** | **SOCIAL SECURITY** | ☐ 892 Economic Stabilization Act |
| | ☐ 362 Personal Injury - Med. Malpractice | | | ☐ 893 Environmental Matters |
| | ☐ 365 Personal Injury - Product Liability | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 894 Energy Allocation Act |
| | ☐ 368 Asbestos Personal Injury Product Liability | | ☐ 862 Black Lung (923) | ☐ 895 Freedom of Information Act |
| **REAL PROPERTY** | **PERSONAL PROPERTY** | ☐ 720 Labor Mgmt Relations | ☐ 863 DIWC/DIWW (405(g)) | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| | ☐ 370 Other Fraud | ☐ 730 Labor Mgmt Reporting & Disclosure Act | ☐ 864 SSID Title XVI | |
| | ☐ 371 Truth in Lending | | ☐ 865 RSI (405(g)) | |
| | ☐ 380 Other Personal Property Damage | | **FEDERAL TAX SUITS** | ☐ 950 Constitutionality of State Statutes |
| | ☐ 385 Property Damage Product Liability | ☐ 740 Labor Railway Act | | ☐ 890 Other Statutory Actions |
| | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | ☐ 871 IRS - Third Party 26 USC 7609 | |
| ☐ 220 Foreclosure | ☐ 442 Employment | | ☐ 790 Other Labor Litigation | |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/Accommodations | **HABEAS CORPUS:** | ☐ 791 Empl. Ret. Inc. Security Act | |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 530 General | | |
| ☐ 245 Tort Product Liability | ☐ 440 Other Civil Rights | ☐ 535 Death Penalty | | |
| ☐ 290 All Other Real Property | | ☐ 540 Mandamus & Other | | |
| | | ☐ 550 Civil Rights | | |
| | | ☐ 555 Prison Condition | | |

## VI. CAUSE OF ACTION
(CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE BRIEF STATEMENT OF CAUSE. DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY.)

Breach of contract, 28 U.S.C. § 1332(a)

## VII. REQUESTED IN COMPLAINT:
CHECK IF THIS IS A CLASS ACTION ☐ UNDER F.R.C.P. 23
DEMAND: In excess of $75,000.00
CHECK YES only if demanded in complaint:
JURY DEMAND: ☒ YES  ☐ NO

## VIII. RELATED CASE(S) IF ANY
(See instructions)
JUDGE: 
DOCKET NUMBER:

DATE: 06-29-07
SIGNATURE OF ATTORNEY OF RECORD: /s/ James D. Heisman

**FOR OFFICE USE ONLY**
RECEIPT #       AMOUNT       APPLYING IFP       JUDGE       MAG. JUDGE